IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
March 27, 2017
Lyle W. Cayce
Clerk

No. 16-10510

BWP MEDIA USA, INCORPORATED, doing business as Pacific Coast News; NATIONAL PHOTO GROUP, L.L.C.,

  Plaintiffs - Appellants

v.

T & S SOFTWARE ASSOCIATES, INCORPORATED,

  Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, CLEMENT, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

  This appeal is about whether "volitional conduct" is required to establish a claim for direct copyright infringement. Defendant T&S Software Associates, an internet service provider, hosted an internet forum on which third-party users posted images that infringed copyrights owned by plaintiffs BWP Media USA and National Photo Group. The plaintiffs sued T&S for direct and secondary copyright infringement. The district court granted summary judgment in favor of T&S. The plaintiffs appeal the district court's direct-infringement holding. We AFFIRM.

No. 16-10510

FACTUAL AND PROCEDURAL BACKGROUND

T&S hosts a website that includes a public forum called "HairTalk." Users of the forum may post content, share comments, ask questions, and engage in online interactions with other users on a range of topics including hair, beauty, and celebrities. Use of HairTalk is governed by terms of service providing that "any photo containing . . . celebrities . . . or any copyrighted image (unless you own the copyright) is not permitted." Every time someone logs on to HairTalk, the user must agree to these terms. Also, each page of the website includes a "contact us" link, which allows anyone to contact the website to report objectionable content. During the relevant time period, T&S did not have an agent designated to receive notices of content that should be removed as required to qualify for the statutory safe harbor of the Digital Millennium Copyright Act ("DMCA"). The specific section on the protections arising from naming an agent is 17 U.S.C. § 512(c).

Plaintiffs BWP Media USA and National Photo Group (collectively, "BWP") are registered owners of various celebrity photographs. Three photographs owned by BWP were posted by third-party users on HairTalk without BWP's permission. They depicted Ke$ha, Julianne Hough, and Ashlee Simpson. BWP sued for copyright infringement. The suit claimed that T&S was liable for its users' infringement because it failed to designate a registered agent under Section 512. T&S learned of the photographs upon commencement of this suit and promptly removed them. The district court granted summary judgment in favor of T&S as to both direct and secondary infringement. BWP appeals the district court's judgment only as to T&S's direct-infringement liability.

DISCUSSION

We review a grant of summary judgment *de novo*, applying the same standard as the district court. *Ibe v. Jones*, 836 F.3d 516, 526 (5th Cir. 2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Here, there is no factual dispute; the case turns on the proper interpretation of the Copyright Act. We review the district court's interpretation of the Act *de novo*. *Comput. Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 399–400 (5th Cir. 2000).

The determinative issue on appeal is whether volitional conduct is required to prove a claim of direct infringement. Our answer starts with the text of the Copyright Act. The Act gives a copyright owner "the exclusive right[]" to "reproduce the copyrighted work" and "display" it "publicly." 17 U.S.C. § 106(1), (5). "Anyone who violates any of the exclusive rights of the copyright owner as provided by section[] 106 . . . is an infringer . . . ." *Id.* § 501(a). Thus, a plaintiff generally must prove two elements to establish infringement: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

When there is a question as to who infringed, the analysis can turn on whether the type of infringement is direct or secondary. Direct liability is imposed on those who "trespass[] into [the copyright owner's] exclusive domain by using or authorizing the use of the copyrighted work . . . ." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984). Secondary infringement involves liability for actions of third parties. *See Metro-Goldwyn-*

*Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  Only direct infringement is at issue on this appeal.

In direct-infringement cases, courts have trended toward requiring volitional conduct.  This requirement first came to the fore in 1995 when a California district court held that an ISP serving as a passive conduit for copyrighted material was not liable for direct infringement.  *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, 907 F. Supp. 1361 (N.D. Cal. 1995).  There, a user posted copyrighted works to an online bulletin board.  *Id.* at 1365.  The owners of the copyrighted works, seeking compensation for infringement, sued the operator of the bulletin-board service and the ISP that the operator used to access the internet.  *Id.*  The court reasoned that "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party."  *Id.* at 1370.

Accordingly, the court rejected the plaintiffs' argument that the ISP stored and thereby copied the copyrighted works: "Where the infringing subscriber is clearly directly liable for the same act, it [would] not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement [was] nothing more than setting up and operating a system that is necessary for the functioning of the Internet."  *Id.* at 1372.  The court did "not find workable a theory" that would hold online parties, such as ISPs, liable "for activities that cannot reasonably be deterred."  *Id.*  Thus, because the *Netcom* plaintiffs could not show that either the ISP or bulletin-board service was actively involved in the infringement, the court held neither was liable as a direct infringer.  *Id.* at 1372–73, 1381–82.

Other courts followed.  The Fourth Circuit was an early adopter of *Netcom* and the volitional-conduct requirement.  *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004).  There, the copyright owner sued an

ISP, LoopNet, for direct infringement after "CoStar's copyrighted photographs were posted by LoopNet's subscribers on LoopNet's website." *Id.* at 546. Like the copyright owners in *Netcom*, CoStar argued its "photographs were copied into LoopNet's computer system," and so LoopNet was strictly liable, even though LoopNet's actions were passive. *Id.* The court disagreed. It held instead that because LoopNet, as an ISP, was "simply the owner and manager of a system used by others who [were] violating CoStar's copyrights and [was] not an actual duplicator itself, it [was] not *directly* liable for copyright infringement." *Id.*

The Fourth Circuit also rejected the argument that "any immunity for the passive conduct of an ISP such as LoopNet must come from the safe harbor immunity provided by the Digital Millennium Copyright Act ('DMCA'), if at all, because the DMCA codified and supplanted the *Netcom* holding." *Id.* at 548. *Netcom*, the court concluded, "grounded its ruling principally on its interpretation of § 106 of the Copyright Act as implying a requirement of 'volition or causation' by the purported infringer," not only on pragmatic concerns or a gap in the law. *Id.* at 549. The court commended *Netcom*'s approach in part because the Act "requires *conduct* by a person who causes in some meaningful way an infringement." *Id.* Thus, "to establish *direct* liability under §§ 501 and 106 of the Act, something more must be shown than mere ownership of a machine used by others to make illegal copies." *Id.* at 550. Instead, "[t]here must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *Id.*

In a developing line of authority, every circuit to address this issue has adopted some version of *Netcom*'s reasoning and the volitional-conduct requirement. *See, e.g., Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666–67

(9th Cir. 2017); *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 387 (3d Cir. 2016); *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008).[1]

BWP argues we should not step into this line because the Supreme Court's 2014 decision in *Aereo* rejected both the *Netcom* line of cases and the volitional-conduct requirement generally. *See American Broadcasting Cos. v. Aereo, Inc.*, 134 S.Ct. 2498 (2014). In that case, Aereo was sued for allegedly infringing the petitioners' exclusive right to perform their copyrighted works publicly under Section 106(4) "by selling its subscribers a technologically complex service that allow[ed] them to watch television programs over the Internet at about the same time as the programs [were] broadcast over the air."[2] *Id.* at 2503. The first issue was whether Aereo "perform[ed]." *Id.* at 2504. The Supreme Court compared Aereo's service to the community-antenna-television ("CATV") systems that Congress had meant to bring within the Act's scope via a set of 1976 amendments.[3] *Id.* Although it acknowledged

---

[1] We recognize, as other courts have, that "the word 'volition' in this context does not really mean an 'act of willing or choosing' or an 'act of deciding' . . . ." *Giganews*, 847 F.3d at 666. One court decided the word "stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts." *Id.* (quotation marks omitted). It also has been held that "volition requires a relationship between the system owner and the copyrighted work that will permit the owner to prevent infringement of the work without the necessity of monitoring the behavior of third parties." Robert C. Denicola, *Volition and Copyright Infringement*, 37 CARDOZO L. REV. 1259, 1276 (2016). At the very least, the Act "requires conduct by a person who causes in some meaningful way an infringement." *CoStar*, 373 F.3d at 549 (emphasis omitted).

[2] Aereo's system allowed a subscriber to select a show from Aereo's website, after which Aereo's system, consisting of thousands of antennas in a centralized warehouse, responded as follows. First, a server tuned an antenna, dedicated to one subscriber alone, to the broadcast carrying the selected show. Next, a transcoder translated the signals received into data that could be transmitted over the internet. A server would save that data into a subscriber-specific folder and then begin streaming the show onto the subscriber's screen once a few seconds of programming had been saved. This continued until the subscriber watched the entire show. *See Aereo*, 134 S. Ct. at 2503.

[3] The CATV provider used a system of antennas on hills to "amplif[y] and modulate[] [copyrighted local TV] signals in order to improve their strength and efficiently transmit

that Aereo's subscribers selected the content to be performed, the Court concluded that "[g]iven Aereo's overwhelming likeness to the cable companies targeted by the 1976 amendments, this sole technological difference between Aereo and traditional cable companies does not make a critical difference . . . ." *Id.* at 2507. Then, after also concluding that Aereo performed "publicly," the Court held Aereo was liable for infringement. *Id.* at 2508. The Court never addressed whether Aereo's conduct was volitional, resting its holding instead on the similarities between the CATV systems and Aereo's system.

We find the dissent to be helpful in understanding the decision. Justice Scalia concluded that Aereo could not be held directly liable because, among other things, it did not engage in volitional conduct. *Id.* at 2512 (Scalia, J., dissenting). To him, whether a defendant may be held directly liable "[m]ost of the time . . . will come down to who selects the copyrighted content: the defendant or its customers." *Id.* at 2513. He then offered a comparison:

> A comparison between copy shops and video-on-demand services illustrates the point. A copy shop rents out photocopiers on a per-use basis. One customer might copy his 10-year-old's drawings—a perfectly lawful thing to do—while another might duplicate a famous artist's copyrighted photographs—a use clearly prohibited by § 106(1). Either way, *the customer* chooses the content and activates the copying function; the photocopier does nothing except in response to the customer's commands. Because the shop plays no role in selecting the content, it cannot be held directly liable when a customer makes an infringing copy.
>
> Video-on-demand services, like photocopiers, respond automatically to user input, but they differ in one crucial respect:

---

them to [the home TV sets of its] subscribers." *Aereo*, 134 S. Ct. at 2504. The subscriber could choose any program he wanted to watch by turning the knob on his TV set. In two prior cases, the Court had held CATV providers were not infringers, but Congress amended the Copyright Act in 1976 "in large part to reject the Court's holdings in" those cases. *Id.* at 2505. Congress clarified that "both the broadcaster and the viewer of a television program 'perform,' because they both show the program's images and make audible the program's sounds." *Id.* at 2506 (emphasis omitted).

> *They choose the content.* When a user signs in to Netflix, for example, 'thousands of . . . movies and TV episodes' carefully curated by Netflix are 'available to watch instantly.' That selection and arrangement by the service provider constitutes a volitional act directed to specific copyrighted works and thus serves as a basis for direct liability.

*Id.* at 2513 (alteration and citation omitted).

Justice Scalia concluded that Aereo was neither one of his examples; instead, it was like "a copy shop that provides its patrons with a library card," providing both the technology and indirect access to the content. *Id.* at 2514. Because such a shop does not itself *choose* the content, it does not act with the requisite volition and thereby does not directly infringe. *Id.* Neither, he concluded, did Aereo. *Id.*

The Court rejected this argument primarily because Aereo's service was not materially distinguishable from the CATV systems. *Id.* at 2507. The Court did not, though, explicitly reject Justice Scalia's formulation of the volitional-conduct requirement. Indeed, it noted that "[i]n other cases involving different kinds of service or technology providers, a user's involvement in the operation of the provider's equipment and selection of the content transmitted may well bear on whether the provider performs within the meaning of the Act." *Id.* The systems used by Aereo and the CATVs were just too similar for such factors to matter in that case.

BWP argues that when the majority rejected Justice Scalia's dissenting copy-shop argument as "mak[ing] too much out of too little," *id.* at 2507, it at least eroded the volitional-conduct requirement. We disagree. As the Ninth Circuit recently concluded, *Aereo* "did not expressly address the volitional-conduct requirement for direct liability under the Copyright Act, nor did it directly dispute or comment on Justice Scalia's explanation of the doctrine." *Giganews*, 847 F.3d at 667. Thus, "it would be folly to presume that *Aereo*

8

categorically jettisoned [the volitional-conduct requirement] by implication," both because *Aereo* itself distinguished between engaging in activity and merely supplying equipment and because it limited its holding to the technology at issue. *Id.* (quotation marks omitted). We likewise conclude that "[t]he volitional-conduct requirement is consistent with the *Aereo* majority opinion . . . ." *See id.*

Before leaving *Aereo,* we also distinguish its facts. When a copy-shop owner makes a photocopier available to customers, but a customer brings in the copyrighted work and makes the copy himself, the infringing conduct is attributable only to the customer. That is because the copy-shop owner does not reproduce the work but "merely supplies equipment that allows others to do so." *See Aereo*, 134 S. Ct. at 2504. Aereo did not just provide equipment. It also provided access and the means to transmit the infringing material. *See id.* at 2506–07.

The facts here are much closer to those in the *Netcom* line of cases than those in *Aereo*. Although Aereo and T&S both provided a service that others could use to infringe, only Aereo played an active role in the infringement. That role was to route infringing content to its users. True, its users would request the content, but they did not merely utilize Aereo's service to store infringing content they obtained elsewhere. Aereo, not its users, provided the means to obtain and transmit copyrighted performances. Aereo's involvement, in other words, was more than passive. *Cf. Aereo*, 134 S. Ct. at 2507.

The same cannot be said of T&S's conduct. T&S hosts the forum on which infringing content was posted, but its connection to the infringement ends there. The users posted the infringing content. Unlike Aereo, T&S did not provide them access to that content. Holding T&S directly liable thus raises the same concern as it did in *Netcom*: "it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the

9

infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *See Netcom*, 907 F. Supp. at 1372. Like *Netcom* and unlike *Aereo,* T&S and the infringing content are not linked by volitional conduct. It cannot be said that T&S's conduct "cause[d] in some meaningful way an infringement." *See CoStar*, 373 F.3d at 549.

BWP also argues that because *Netcom* predated the DMCA, its analysis is no longer good law. The particular argument is that the safe-harbor rules of Section 512(c) created the exclusive method of protecting an arguably innocent ISP: if a user directs the storage of copyrighted material on a service provider's system, the ISP has no liability if (1) the provider lacks knowledge of the infringement, (2) does not receive direct financial benefits from the storage, (3) "acts expeditiously to remove, or disable access to," the infringing material once learning of it, and (4) "has designated an agent to receive notifications of claimed infringement[.]" 17 U.S.C. § 512(c).

T&S does not qualify for Section 512(c)'s safe harbor, as it never designated an agent. To BWP, adopting the volitional-conduct requirement would render Section 512(c)'s safe harbor meaningless. BWP also argues that adopting the requirement would disincentivize DMCA compliance by benefitting those ISPs that choose not to satisfy Section 512(c)'s requirements.

T&S points out that Section 512 includes a caveat: "The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense." *See* § 512(*l*). T&S argues that this means the DMCA does not abrogate the volitional-conduct requirement.

The Fourth Circuit addressed this argument in *CoStar*. It too faced the argument that because "Congress 'codified' *Netcom* in the DMCA . . . it can only be *to the DMCA* that we look for enforcement of those principles." *CoStar*,

373 F.3d at 552 (alterations in original). The court disagreed, judging that CoStar's argument was "belied by the plain language of the DMCA itself":

> Even though the DMCA was designed to provide ISPs with a safe harbor from copyright liability, nothing in the language of § 512 indicates that the limitation on liability described therein is exclusive. Indeed, [Section 512(*l*)] provides explicitly that the DMCA is *not* exclusive . . . . Given that the statute declares its intent not to "bear adversely upon" any of the ISP's defenses under law, including the defense that the plaintiff has not made out a prima facie case for infringement, it is difficult to argue, as CoStar does, that the statute in fact precludes ISPs from relying on an entire strain of case law holding that direct infringement must involve conduct having a volitional or causal aspect.

*Id.* The court also referred to the canon of construction for abrogation of the common law: "When Congress codifies a common-law principle, the common law remains not only good law, but a valuable touchstone for interpreting the statute, unless Congress explicitly states that it *intends* to supplant the common law." *Id.* at 553.

So the Fourth Circuit held that the "DMCA's safe harbor for ISPs [is] a floor, not a ceiling, of protection." *Id.* at 555. Rather than altering the volitional-conduct requirement, "[t]he DMCA has merely added a second step to assessing infringement liability for [ISPs], after it is determined whether they are infringers in the first place under the preexisting Copyright Act." *Id.* In other words, whether there is volitional conduct is the first step of establishing infringement under Sections 106 and 501. *See id.* Only if the plaintiff shows such infringement are courts to analyze whether the ISP nonetheless falls within Section 512's safe harbor. *See id.*[4]

---

[4] *Accord Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 n.4 (9th Cir. 2007) ("[T]he DMCA does not change copyright law; rather, 'Congress provided that the DMCA's limitations of liability apply if the provider is found to be liable under existing principles of law.'" (alteration omitted) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004))); *BWP Media USA Inc. v. Polyvore, Inc.*, No. 13-CV-7867(RA), 2016 WL 3926450, at *6

We agree with the Fourth Circuit's analysis on this point. BWP also argues that retaining the volitional-conduct requirement diminishes Section 512(c)'s usefulness in direct-infringement cases. That may be, but it does not in secondary-infringement cases. *See, e.g.*, *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1175 (9th Cir. 2007). Textual meaning and incentives to comply both remain.

\* \* \*

We adopt the volitional-conduct requirement in direct-copyright-infringement cases. BWP does not contend that T&S did, in fact, engage in such conduct. Thus, the district court properly granted summary judgment in favor of T&S. AFFIRMED.

---

(S.D.N.Y. July 15, 2016) ("In light of this unambiguous statutory language and clear legislative history, the Court rejects Plaintiffs' argument that, in passing the DMCA, Congress intended to subject ISPs to different standards of copyright liability than non-ISPs.").